IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBERT NEWTON,<br><br>Plaintiff,<br><br>v.<br><br>UTAH NATIONAL GUARD et al.,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No. 2:07-cv-00041 CW<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

Plaintiff Robert Newton ("Newton") was an air traffic controller for the Utah Air National Guard (the "Guard"). He started his employment as a military member, but later ceased being a military member and became solely a civilian employee of the Guard. In November 2003, Newton's direct supervisor, Major John R. Teter ("Major Teter") verbally suspended Newton's Air Traffic Control Specialist certificate ("ATCS certificate") because Newton purportedly posed a hazard to flying safety. Subsequently, however, the National Guard withdrew his ATCS certificate. Without the certificate, he cannot be employed as an air traffic controller. Newton claims he was denied procedural due process and equal protection when the military withdrew his license.

Defendants[1] move for summary judgment on Newton's claims. The court concludes that Newton has failed to state a claim against Brian L. Tarbet and Brent E. Winget, and dismisses them

---

[1] The moving defendants include Brian L. Tarbet, Brent E. Winget, Wayne E. Lee, and John R. Teter (collectively "Defendants").

from the case. The court further concludes that Newton has failed to meet his burden on his employment claims relating to procedural due process claim and equal protection. Accordingly, those claims are dismissed. The court denies summary judgment on the remaining issues raised by Defendants.

## FACTUAL BACKGROUND

**Newton's Employment as an Air Traffic Controller**

In 1968, Newton obtained an Air Traffic Control Specialist ("ATCS") certificate from the Federal Aviation Administration.[2] After working at civilian air traffic centers, Newton started working for the Utah Air National Guards' 299 RCS unit in August 1985. Although he was initially hired as a military member, in December 1988, Newton also was hired as a civilian Air Traffic Control Specialist by the Utah Adjutant General. Newton continued in this dual-status position until he retired from the military in December 2002.[3] He then continued his employment with the Guard solely as a civilian Air Traffic Control Supervisor.

During the relevant time period, Newton's direct supervisor was Major Teter, the Director of Operations. Major Teter reported to Lieutenant Colonel Wayne E. Lee ("Lt. Col. Lee"), the Squadron's Commander. Brigadier General Brent E. Winget ("Brig. Gen. Winget") is the State Air National Guard Commander of Utah, and Major General Brian L. Tarbet ("Major Gen. Tarbet") is and was at all relevant times the Adjutant General of the Utah National Guard.

---

[2] First Amended Complaint, ¶¶ 11–12 (Docket No. 1, Ex. A).

[3] Retirement Record of Newton, Robert W. (effective Aug. 25, 2006) (Docket No. 60, Ex. G).

**Air Traffic Control Violations**

Between January 8, 2002 and November 17, 2003, Defendants assert that five air traffic incidents occurred while Newton was the Watch Supervisor, which posed a hazard to flying safety.

January 8, 2002 Incident

On January 8, 2002, a loss of separation[4] occurred between two groups of F-16s. The Incident Review Board determined the loss of separation was caused primarily by an air traffic controller,[5] and he was decertified as a consequence. The board further determined that the "Watch Supervisor [was] being relieved and [was] briefing the oncoming supervisor" at the time of the incident.[6] The board did not state that the Watch Supervisor was a contributing factor to the incident.[7] Accordingly, he was not removed from duty, retrained, or recertified. Instead, the board recommended that the Watch Supervisor be counseled.[8] A memorandum from Major Teter to a pilot states the Watch Supervisor was reprimanded,[9] but the parties dispute that Newton was reprimanded and that he was *the* Watch Supervisor mentioned. No document of the reprimand exists in Newton's

---

[4] A loss of separation is less than five miles horizontal distance between aircraft or less than a thousand feet vertical distance between aircraft. Deposition of John R. Teter, 62:2–11 (Docket No. 61, Ex. 2) (hereinafter "Teter Depo).

[5] Memorandum re Incident Review Findings, 2 (Jan. 10, 2002) (Docket No. 61, Ex. 24).

[6] *Id.*

[7] *Id.*

[8] *Id.* at 3.

[9] Teter Depo., 146:2–16 (Docket No. 61, Ex. 2).

971 record.[10]

January 15, 2003 Incident

Approximately one year later, an F-16 improperly dropped ordnance,[11] in a target area that was closed, after receiving clearance from an air traffic controller. The Incident Review Board noted that the controller was not timely suspended, but allowed to continue working for two days before being suspended.[12] Thus, the board recommended that the Watch Supervisor be counseled and receive a review of the suspension procedures.[13] The board did not state, however, that the Watch Supervisor contributed to the incident.[14] Newton does not dispute that he was the Watch Supervisor at the time of this incident.

March 24, 2003 Incident

On March 24, 2003, an air space violation occurred when an aircraft "entered Salt Lake Approach's airspace without proper coordination."[15] The Incident Review Board recommended that two controllers be decertified, and that all controllers have a review training.[16] No recommendation

---

[10] *See* Report of Individual Person (Docket No. 61, Ex. 25) (hereinafter "971 Record"); *see also* Teter Depo., 146:10–22 (Docket No. 61, Ex. 2). A 971 record contains a "running description of events in an employee's employment." *Id.* at 58:20–59:3.

[11] Ordnance includes military supplies such as bombs and artillery.

[12] Memorandum re: Incident Review Findings, 2 (Jan. 22, 2003) (Docket No. 61, Ex. 26).

[13] *Id.*

[14] *Id.* at 1–2; Teter Depo., 156:21–157:9 (Docket No. 61, Ex. 2).

[15] Memorandum re: Incident Review Findings, 1 (Mar. 24, 2003) (Docket No. 61, Ex. 27).

[16] *Id.* at 2.

was made specifically regarding the Watch Supervisor,[17] and it was not found that the Watch Supervisor was a factor in the incident.[18]  Newton does not dispute that he was the Watch Supervisor at the time of this incident.

June 3, 2003 Incident

A fourth incident occurred on June 3, 2003.  A loss of separation occurred between an F-16 and a civilian Skywest Airlines Regional Jet.  At the time of the incident, the radar and assist controllers were newly qualified, and had asked Newton for additional help.[19]  Newton, however, did not assign additional help,[20] nor was he aware that a loss of separation had occurred because the controllers did not report it.[21]  The Incident Review Board concluded that "Newton failed to adequately supervise and support the controllers after they asked for [help]."[22]  Accordingly, the board recommended that Newton be suspended and then retrained before returning to duty.[23]  Major Teter suspended him for five days.[24]  The suspension letter stated, "[t]he seriousness of this offense is called to your attention and you're advised that further violation of regulations or rules could result

---

[17]  *Id.*

[18]  Deposition of Wayne E. Lee, 91:13–92:3 (Docket No. 61, Ex. 20).

[19]  Memo. in Opp., ¶ 64, at xxxiii (Docket No. 57).

[20]  Memorandum re: Incident Review Findings, 3 (Docket No. 61, Ex. 30).

[21]  *Id.* at 2.

[22]  *Id.* at 3.

[23]  *Id.*

[24]  Memo. in Opp., ¶ 68, at xxxv (Docket No. 57).

in more serious disciplinary action, including removal."[25]  No mention was made that the disciplinary action could include withdrawal of his ATCS certificate.

<u>November 17, 2003 Incident</u>

The final incident occurred about five months later, which involved a loss of separation between an F-16 and a civilian aircraft.  The loss of separation was between 2.7 to 3.1 nautical miles. When the controller said the F-16 had crossed a civilian aircraft's altitude, Newton looked at the radar scope and determined there was sufficient horizontal separation.[26]  A sergeant also reached the same conclusion.[27]  Later, however, Chief Controller Ray Smith ("Smith") learned about the incident from the F-16 pilot and reported it to Major Teter.

The Incident Review Board debated what finding it should make regarding Newton.[28]  Two of the three board members concluded that Newton was not at fault.[29]  Smith was the third member and he encouraged the other two to change the report to place blame on Newton, but they were reluctant.[30]  Ultimately, the report questioned whether the Watch Supervisor made "every effort to

---

[25]  Deposition of Robert W. Newton, 87:10–88:4 (Docket No. 49, Ex. 2).

[26]  Declaration of Robert Newton, ¶ 5 (Dec. 19, 2003) (Docket No. 61, Ex. 28).

[27]  Declaration of John M. Sargent, ¶ 4 (Docket No. 61, Ex. 33).

[28]  Deposition of Micah Kenneth Tebbs, 47:7–11 (Docket No. 61, Ex. 15) (hereinafter "Tebbs Depo.").

[29]  *See id.* at 47:12–48:12; Deposition of Joe Taranto, 31:10–23 (Docket No. 61, Ex. 16) (hereinafter "Taranto Depo.").

[30]  Tebbs Depo., 48:13–24 (Docket No. 61, Ex. 15); Taranto Depo., 31:24–32:14 (Docket No. 61, Ex. 16).

relieve the controllers involved."[31]  Thus, it recommended that the Watch Supervisor explain "why facility procedures were not adhered to when a suspected loss of separation occurred."[32]

**Suspension Actions**

<u>Verbal Suspension</u>

Before the board's investigation began on the last incident, Major Teter and Lt. Col. Lee concluded that "we wanted [Newton] removed, as in separated from government service.  That was our initial thoughts at the time."[33]  Major Teter admitted during deposition that regardless of what Newton said about the incident, "it didn't matter," they "were going to recommend that [his certificate] be withdrawn."[34]  Accordingly, once the board issued its report, Major Teter verbally suspended Newton because he purportedly posed a hazard to flying safety.  Major Teter testified during deposition that he relieved Newton from duty on November 20, 2003.[35]

The following documents reference Newton's suspension, but the parties dispute their meaning.  On November 20, 2003, Major Teter sent an e-mail to a person in human resources, which stated, "I relieved Mr. Newton from duty and suspened [sic] his Air Traffic Control Certification indefinitely as a result of the Near Mid-Air Collision which occurred 17 NOV."[36]  This e-mail

---

[31]  Memorandum re: Incident Review Findings, 3 (Nov. 19, 2003) (Docket No. 61, Ex. 34).

[32]  *Id.*

[33]  Teter Depo., 125:23–25 (Docket No. 61, Ex. 2).

[34]  *Id.* at 212:22–213:1.

[35]  *See id.* at 119:10–22.

[36]  E-mail from Major Teter to Michael Allred (Nov. 20, 2003) (Docket No. 61, Ex. 35). Major Teter admitted during his deposition that the incident did not involve a near mid-air collision,

indicates Major Teter took two actions on November 20th—he relieved Newton from duty and suspended a certification. An entry on Newton's 971 report, also dated November 20, 2003, states, "Relieved Mr. Newton from duty and cancelled positional certifications . . . ."[37] Another entry, dated November 26, 2003, states, "Suspended Mr. Newton's ATC certification and starting process to permanently withdraw his ATCS certificate."[38] Major Teter also issued a memorandum on November 26, 2003 stating, "The Watch Supervisor has been relieved of duty pending action."[39] Major Teter subsequently altered the memorandum to state,

> The Watch Supervisor on duty has been permanently suspended from ATC duties and termination action is pending. This is a result of his failure to take any action after this incident as well as multiple other incidents in the past that have resulted in the determination that he is a hazard to flight safety.[40]

Major Teter testified that he altered the document "[t]o add clarification."[41] He further testified that he did not suspend Newton's ATCS certificate on November 20, 2003 because he lacked authority to do so.[42] In contrast, Newton asserts Major Teter did suspend his ATCS certificate on that date.

---

but only a loss of separation. Teter Depo., 121:2–123:2 (Docket No. 61, Ex. 2).

[37] 971 Record, 5 (Docket No. 61, Ex. 25).

[38] *Id.* While the entry is dated November 26, 2003, Major Teter testified during deposition that the record had been modified to clean it up and make it more accurate. Teter Depo., 87:21–88:4 (Docket No. 61, Ex. 2). Thus, the 971 report was not made contemporaneously with the event and the date may not indicate the date on which the event actually occurred. *Id.* at 88:25–89:14.

[39] Memorandum for C4-A (Nov. 26, 2003) (Docket No. 49, Ex. 6, No. 25).

[40] Modified Memorandum for C4-A (Nov. 26, 2003) (Docket No. 61, Ex. 39).

[41] Teter Depo., 222:5–10 (Docket No. 61, Ex. 2).

[42] *Id.* at 119:10–22.

Besides suspension of an ATCS certificate, a person also may be suspended from a position certification or a facility rating. If one looks at the entries on the 971 form and the altered memorandum, one could interpret the documents to state that Major Teter suspended Newton from his position as an air traffic controller on November 20, 2003,[43] and had started the process to withdraw his ATCS certificate. Hence, one could interpret these documents to mean Newton was suspended from his position, or his ATCS certificate was suspended, or both. This is a disputed fact.

Written Suspension

On Sunday, December 7, 2003, Lt. Col. Lee signed a memorandum with the following subject line: "ATCS Certificate Suspension (Pending Withdrawal)."[44] Among other things, the memorandum informed Newton,

> 1. Under the provisions of AFI-13-203, I suspend your ATCS certificate and restrict you from performing air traffic control duties. This suspension will remain in effect pending the results of the evaluation of your case. It has been determined that you are a hazard to aviation safety for repeated failure in performing the duties of an Air Traffic Control Supervisor.
>
> 2. After receipt of the evaluation results, I may take action to withdraw your ATCS certificate without further notice. If I, or the review authority, determines your withdrawal is for reasons within your control it could result in your termination.[45]

---

[43] Although Major Teter may not have had authority to suspended Newton's ATCS certificate, he did have authority to suspend him from his position. *See id.* at 119:10–20.

[44] Memorandum for Mr. Robert Newton (Dec. 7, 2003) (Docket No. 49, Ex. 2, No. 3).

[45] *Id.*

The memorandum also informed Newton he had ten business days to respond to the memorandum.[46] Major Teter left the memorandum on Newton's desk and Newton received it on December 8, 2003.[47]

Paragraph 14.4.1 of the Air Force Instruction ("AFI") 13-203, states if a person is suspended from a *position* or *facility* for a safety hazard, "[w]ithin 10 workdays, re-enter the controller into training, or cancel their ratings, or cancel position certification or initiate AFSC withdrawal."[48] Newton contends that no actions were taken between his verbal suspension on November 20, 2003 and the written suspension of his ATCS certificate on December 7, 2003. If Newton was suspended from his position on November 20, 2003, then his employers potentially violated procedure by failing to take additional action within 10 days of the suspension.

**Written Communications and Exchange of Information**

On December 12, 2003, Newton's attorney sent a letter to Lt. Col. Lee (the "December 12th Letter") asking him to detail the alleged failures that caused Lt. Col. Lee to initiate "ATCS Certificate Suspension Pending Withdrawal" because the reasons were not stated in the December 7, 2003 memorandum.[49] He also asked for an extension of time in which to respond to the memorandum until after he received the statement of reasons.[50] By December 19, 2003, Lt. Col. Lee

---

[46] *Id.* ¶ 4.

[47] First Amended Complaint, ¶ 21 (Docket No. 1, Ex. A).

[48] AFI 13-203, ¶ 14.4.1 (Docket No. 61, Ex. 5).

[49] Letter from D. Scott Crook to Lt. Col. Lee (Dec. 12, 2003) (Docket No. 49, Ex. 2, Attach. 4).

[50] *Id.* at 2.

had not responded.[51]  Accordingly, to meet the 10-day deadline for a response, Newton's attorney

sent a second letter (the "December 19th Letter") that noted it was impossible for Newton to

determine the basis for disciplinary action.[52]  He surmised, though, that it was due to the June 3,

2003 Incident and the November 17, 2003 Incident due to a memorandum Newton received from

Major Teter on a different matter.[53]  Consequently, the December 19th Letter contained Newton's

statements about those incidents.[54]  He also attached statements from three other air traffic

controllers to support that Newton did not present a danger to aviation safety.[55]

In a memorandum, dated December 23, 2003, Lt. Col. Lee responded to the December 12th

Letter.  He informed Newton's attorney that the ATCS Certificate Suspension Pending Withdrawal

was based on the five incidents detailed above.[56]  He further stated that a "package, including your

information, will be forwarded to Major Command Headquarters for final determination of his ATC

Certificate status."[57]  Lt. Col. Lee did not detail, however, when the package would be sent or what

---

[51]  Letter from D. Scott Crook to Lt. Col. Lee, 2 (Dec. 19, 2003) (Docket No. 49, Ex. 2, Attach. 5).

[52]  *Id.* at 2–3.

[53]  *Id.* at 3.

[54]  *See id.* at 3–6.

[55]  *See id.* at 6; *see also* Declaration of Andrew Ocana (Dec. 19, 2003) (Docket No. 61, Ex. 18); Declaration of John D. Bellmon (Dec. 18, 2003) (Docket No. 61, Ex. 32); Declaration of John M. Sargent (Dec. 19, 2003) (Docket No. 61, Ex. 33).

[56]  Memorandum for Smith/Hartvigsen/PLLC (Dec. 23, 2003) (Docket No. 49, Ex. 2, Attach. 8).

[57]  *Id.* ¶ 3.

it would contain.[58]  Although the 10-day period for Newton's response had run, Lt. Col. Lee also informed Newton's attorney that his requested extension was granted.[59]  Due to this statement of reasons, Newton's attorney sent a third letter on December 29, 2003, asking for the regulations and materials relied on to support the reasons listed.[60]  He specifically requested "all files, including the Incident Review Board Findings and all other materials" that were used to support the allegations.[61]  Instead of being provided this information, Newton was merely provided one page from his 971 record.[62]  On January 9, 2004, Newton's attorney sent Lt. Col. Lee a fourth letter (the "January 9th Letter").  Significantly, this letter supplemented the December 19th Letter by providing Newton's statements regarding each of the five incidents.[63]

**Withdrawal Package**

At 4:45 p.m. on January 20, 2004, Ray Smith, Chief Controller, contacted Newton and informed him that the package recommending his withdrawal was being sent to Washington D.C. the following day.[64]  He further informed Newton that if he wanted to include a statement in the

---

[58]  *See id.*

[59]  *Id.* ¶ 7.

[60]  Letter from D. Scott Crook to Lt. Col. Lee (Dec. 29, 2003) (Docket No. 49, Ex. 2, Attach. 9).

[61]  *Id.* at 1–2.

[62]  *See* Facsimile from 299 RCS to Mr. Scott Crook (Jan. 6, 2004) (Docket No. 49, Ex. 6, Attach. 44).

[63]  *See* Letter from D. Scott Crook to Lt. Col. Lee (Jan. 9, 2004) (Docket No. 49, Ex. 2, Attach. 10).

[64]  Letter from D. Scott Crook, 1 (Jan. 21, 2004) (Docket No. 49, Ex. 2, Attach. 11).

package, he would have to do so by 4:00 p.m. the following day.[65] Newton's attorney attempted to

contact different personnel to ask about the procedure, but no one returned his telephone calls.[66]

Thus, in a letter dated January 21, 2004, Newton's attorney objected that he had had insufficient

notice to respond, but incorporated and attached the December 19th Letter and the January 9th

Letter.[67]

Lt. Col. Lee sent Newton's withdrawal package to S. Scott Duke ("Duke") at the National

Guard Bureau, who has the exclusive authority to withdraw an ATCS certificate.[68] The ATCS

Certificate Withdrawal Checklist states the withdrawal package must at least include: (1) a

Commander's cover letter; (2) the ATCS certificate suspension letter; (3) a medical evaluation; (4)

the Controller's statement, with any attached supporting documents (if appropriate); and (5) any

other pertinent documents or statements.[69]

Before sending the withdrawal package, however, Lt. Col. Lee asked Duke "how much of

[Newton's] attorney's stuff you want to review in deciding on the withdrawal proposal."[70] Duke

responded, "with respect to the Attorney stuff, I don't need to see any of it. Just [Newton's]

---

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] Declaration of S. Scott Duke, ¶¶ 1, 7 (Docket No. 49, Ex. 8) (hereinafter "Duke Declaration").

[69] AFI 13-203, Attachment 8, ¶ A8.5 (Docket No. 61, Ex. 5).

[70] E-mail exchange between Lt. Col. Lee and Scott Duke (Docket No. 61, Ex. 43).

statement, if he provided one along with the rest of the required data."[71]  Despite this response, Lt.

Col. Lee did send some of the attorney correspondence.  He informed Duke in a cover memorandum,

"this correspondence is typical of all packages and includes *all* pertinent information relative Mr.

Newton's point of view."[72]  Lt. Col. Lee included the December 12th Letter, the December 19th

Letter, and the January 21, 2004 Letter, apparently without attachments.[73]  Notably, he did not

include the January 9th Letter.  Thus, Newton's statements regarding three of the five incidents were

not included in the package.

Additionally, Lt. Col. Lee included two new additional allegations, without informing

Newton.  One alleged that Newton allowed a "point out" while a military aircraft was using the air

space,[74] and the other alleged that Newton was unethical because he tape-recorded a conversation

between himself and another controller without informing the other controller.[75]  Lt. Col. Lee further

included the Incident Review Board Findings; Major Teter's memoranda summarizing the actions

taken after each incident, which included the altered memorandum on the November 17, 2003

---

[71]  *Id.*

[72]  Memorandum for ANG/C4A [Duke], 2 (Jan. 27, 2004) (Docket No. 49, Ex. 8, Attach. C) (emphasis added).

[73]  Duke Declaration, ¶ 17 & Ex. B (June 17, 2008) (Docket No. 49, Ex. 8).

[74]  "The phrase 'to accept a point out' means to accept responsibility for an aircraft entering the airspace controlled by the 299th Range Control Squadron."  Declaration of John R. Teter, ¶ 25 (Docket No. 49, Ex. 3) (quotations omitted).

[75]  Memorandum for ANG/C4A, ¶¶ 4, 9 (Jan. 27, 2004) (Docket No. 49, Ex. 8, Attach. C). Ironically, Ray Smith informed Major Teter that he had attempted to record a conversation between himself and Newton, but the recording device did not work.  E-mail from Ray Smith to Major Teter (Jan. 20, 2004) (Docket No. 49, Ex. 6, Attach. 51).  No documents have been submitted to show Smith's actions were deemed unethical by Major Teter or Lt. Col. Lee.

incident; statements from Major Teter and Ray Smith indicating they supported the withdrawal; information about Newton's suspension after the June 3, 2003 incident; Lt. Col. Lee's December 7, 2003 and December 23, 2003 memoranda; a doctor's statement stating Newton had normal health; and a declaration from Newton, dated December 19, 2003, that affirmed statements made in the December 19th Letter.[76]

After reviewing this information, Duke withdrew Newton's ATCS certificate. By memorandum, dated February 24, 2004, Major Teter notified Newton that his ATCS certificate had been permanently withdrawn and that he was prohibited from wearing "the ATC career field specialty badge as a retired military member."[77]

**Newton's Appeals**

National Transportation Safety Board

Newton filed an appeal with the National Transportation Safety Board ("NTSB") on March 5, 2004, contesting the withdrawal of his certificate.[78] The NTSB Administrative Law Judge found that it lacked jurisdiction to hear the case because its authority extended only to FAA orders on certificates issued under 49 U.S.C. chapter 447.[79] Because Newton's certificate did not fall under that statute, the NTSB had no authority to review its withdrawal. The United States Court of

---

[76] *See* ATC Certificate Withdrawal Package (Docket No. 49, Ex. 8, Attach. C).

[77] Memorandum for Mr. Robert Newton (Feb. 24, 2004) (Docket No. 49, Ex. 2, Attach. 12).

[78] Letter re Notice of Appeal (Mar. 5, 2004) (Docket No. 49, Ex. 2, Attach. 13).

[79] *Newton v. Fed. Aviation Admin.*, 457 F.3d 1133, 1136 (10th Cir. 2006).

Appeals for the Tenth Circuit concurred, and upheld the ruling.[80]

<u>Formal Grievance</u>

Newton also filed a formal grievance on March 9, 2004.[81]  On that same day, he received a copy of part of the withdrawal package from Major Teter.[82]  Included within that packet was Lt. Col. Lee's cover letter containing the allegations about the "point out" and unethical behavior. Consequently, Newton filed a supplemental grievance that objected to the new allegations and the lack of opportunity to respond to them.[83]  The grievance was forwarded to Colonel C.E. West, Jr. ("Col. West"),  a deputy director in Arlington, Virginia, who had authority to review Duke's decision.  On April 21, 2004, Col. West issued a memorandum upholding Duke's decision.[84]  Col. West stated that the procedural rules were followed in withdrawing Newton's certificate because Newton was given an opportunity to respond to information in the withdrawal package.[85]  He further stated, "[t]here are no further appeals allowed under the AFI."[86]

---

[80]  *Id.* at 1143–44.

[81]  Letter re Formal Grievance/ATC Certificate Withdrawal (Mar. 9, 2004) (Docket No. 49, Ex. 2, Attach. 14).

[82]  Memorandum for Mr. D. Scott Crook, ¶ 3 (Mar. 8, 2004) (Docket No. 49, Ex. 3, Attach. B).

[83]  Supplement to Formal Grievance, 3–5 (Mar. 19, 2004) (Docket No. 49, Ex. 2, Attach. 15).

[84]  Memorandum for Robert Newton (Apr. 21, 2004) (Docket No. 49, Ex. 2 No. 16).

[85]  *Id.* at 1.

[86]  *Id.* at 2.

**FOIA Request**

While Newton was engaged in the appeals process, on March 10, 2004, he also sent a Freedom of Information Act request to Hill Air Force Base for a release of information about his certificate withdrawal. On March 24, 2004, Newton received "a complete copy of the air traffic controller certificate withdrawal packet," including the Incident Review Board Findings.[87] According to the Chief of Hill Air Force Base's Civil Law Division, the documents were released "because Mr. Newton is entitled to them under authority other than the Freedom of Information Act. Namely, Air Force regulations require a supervisor to release to an employee the materials used by the supervisor in taking an adverse action against the employee."[88] Despite Newton's repeated requests for information during the certificate withdrawal process, this was the first time he was provided the complete packet of information that was submitted to Duke.

**Employment Actions**

In addition to attempting to remove his ATCS certificate, Major Teter also initiated proceedings to remove Newton from employment. These proceedings were separate from the certificate withdrawal proceedings and involved different notices, hearings, and appeals. Major Teter initiated the employment proceedings on December 15, 2003, by addressing a memorandum to Newton entitled "Notice of Proposed Removal."[89] The memorandum stated Major Teter intended

---

[87] *See* Letter from James B. Tadje to R. Christopher Preston and D. Scott Crook (Mar. 24, 2004) (Docket No. 61, Ex. 39).

[88] *Id.*

[89] Memorandum for: 299RCS/DO (Dec. 15, 2003) (Docket No. 61, Ex. 45).

to remove Newton from his position after thirty-days notice.[90]  He referenced both the June 3, 2003 incident and the November 17, 2003 incident in the notice and said Newton had "abused [his] position as a supervisor, by not properly supervising [his] subordinates."[91]  Major Teter further stated that he had used the prior incident in calculating the proposed penalty.[92]  He then gave Newton ten calendar days to respond to the notice.[93]

On December 26, 2003, Newton sent a response to Lt. Col. Lee about the notice of proposed removal.  In the response, Newton asserted that the action was premature because the investigation was ongoing and his ATCS had not been withdrawn.[94]  He further asserted that the ATCS withdrawal process was flawed procedurally, and that he had not violated any rules during the November 17, 2003 incident.[95]  Newton contended that, at most, his conduct constituted a "deficiency in performance," which is a non-disciplinary matter.[96]  He then argued that requisite factors were not present to impose the proposed penalty.[97]

---

[90] *Id.* at 1.

[91] *Id.*

[92] *Id.* at 2.  This notice is the one that Newton relied upon in his December 19th Letter, when he attempted to surmise which incidents Lt. Col. Lee was using to suspend his ATCS certificate.

[93] *Id.* at 2.

[94] Letter re: Response to Notice of Proposed Removal, 2–3 (Dec. 26, 2003) (Docket No. 61, Ex. 46).

[95] *Id.* at 3–4.

[96] *Id.* at 13.

[97] *Id.* at 16–18.

By letter, dated January 27, 2004, Lt. Col. Lee informed Newton that he had reviewed his response and determined the proposed penalty was adequately supported.[98] Nevertheless, he decided to reduce the proposed penalty to an unpaid suspension for fourteen days rather than termination.[99] Newton started his unpaid suspension on February 1, 2004 and concluded it on February 14, 2004. After his suspension, Newton returned to paid leave. Although the penalty was reduced to a suspension rather than termination, Newton filed a grievance.[100] Upon review, the suspension was upheld.[101] Newton then filed an appeal to Major General Kevin J. Sullivan,[102] but again the suspension was upheld.[103]

While Newton was contesting his 14-day suspension, Newton received notice on March 1, 2004, that Major Teter was proposing a Separation for Disqualification.[104] By this point, Newton's ATCS certificate had been withdrawn. Consequently, he lacked the qualifications to continue in his

---

[98] Memorandum re: Decision to Suspend, ¶ 2 (Jan. 27, 2004) (Docket No. 49, Ex. 2, Attach. 19).

[99] *Id.*

[100] Letter re: Robert Newton, Formal Grievance (Feb. 6, 2004) (Docket No. 49, Ex. 2, Attach. 20).

[101] Memorandum re: Administrative Grievance 02-002, 14 Calendar Day Suspension (Apr. 1, 2004) (Docket No. 49, Ex. 2, Attach. 21).

[102] Letter re: Robert Newton, Review of Final Finding by Colonel Larry T. Johnson Dated April 1, 2004 (Apr. 14, 2004) (Docket No. 49, Ex. 2, Attach. 22).

[103] Letter from Major General Kevin J. Sullivan to Newton (June 14, 2004) (Docket No. 49, Ex. 2, Attach. 23).

[104] Letter re: Notice of Proposed Separation for Disqualification (Mar. 1, 2004) (Docket No. 49, Ex. 2, Attach. 24).

position; hence, the notice of proposed Separation for Disqualification. Again, Newton opposed the separation, and Lt. Col. Lee rescinded the action.[105]  On that same date, however, Major Teter notified Newton that, until the NTSB completed its review, he was proposing Newton be suspended indefinitely due to his lack of qualifications.[106]  Newton likewise opposed the indefinite suspension,[107] but Lt. Col. Lee concluded the suspension was appropriate.[108]  The indefinite suspension took effect July 25, 2004,[109] and ultimately, remained in effect until Newton retired in August 2006.

Newton appealed the indefinite suspension to the Merit Systems Protection Board ("MSPB").[110]  The Guard filed a response and moved to dismiss.  In its response, the Guard argued that Newton was a Title 5 employee, and therefore had the right to appeal adverse actions to the MSPB.[111]  Nevertheless, it argued the MSPB should dismiss the action because it lacked authority

---

[105]  Letter re: Decision to Rescind Notice of Proposed Removal (June 22, 2004) (Docket No. 49, Ex. 2, Attach. 26).

[106]  Letter re: Notice of Proposed Indefinite Suspension (June 22, 2004) (Docket No. 49, Ex. 2, Attach. 27).

[107]  Letter re: Robert Newton, Response to Notice of Proposed Indefinite Suspension (July 2, 2004) (Docket No. 49, Ex. 2, Attach. 28).

[108]  Letter re: Decision to Indefinitely Suspend (July 22, 2004) (Docket No. 49, Ex. 2, Attach. 29).

[109]  *Id.*

[110]  MSPB Appeal (July 30, 2004) (Docket No. 49, Ex. 16).

[111]  Agency's Response & Motion to Dismiss, 1 (Aug. 23, 2004) (Docket No. 49, Ex. 4).

to order the Guard to comply with its orders.[112]  It based its argument on the ground that Newton's

"chain of command ends at the Adjutant General of the State of Utah, who is a State Employee," and

the MSPB only has the authority to enforce orders against a federal entity.[113]  Newton concurred the

MSPB lacked authority to enforce a ruling against the Guard.[114]  Thus, he withdrew his appeal.[115]

## ANALYSIS

## I.     STANDARD OF REVIEW

"Summary judgment is appropriate if the moving party demonstrates that 'there is no

genuine issue as to any material fact' and that it is 'entitled to judgment as a matter of law.'"[116]  If

a movant carries its initial burden of proving it is entitled to judgment as a matter of law, "the

nonmovant may not rest solely on his pleadings, but must set out specific facts in support of his

claim by reference to affidavits, deposition transcripts, or other exhibits incorporated therein."[117]  If

the evidence merely contains conclusory allegations, however, such allegations "are insufficient to

establish an issue of fact."[118]  When determining whether a nonmovant has enough evidence to carry

---

[112]  *Id.* at 2.

[113]  *Id.*

[114]  Appellant Robert W. Newton's Withdrawal of Appeal, 1–2 (Sept. 7, 2004) (Docket No. 49, Ex. 2, Attach. 31).

[115]  *Id.* at 2.

[116]  *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 944 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).

[117]  *Jordan v. Fed. Bureau of Prisons*, No. 03-1104, 2006 U.S. App. LEXIS 32290, at *21–22 (10th Cir. Sept. 18, 2006) (citation omitted).

[118]  *Barber v. Colorado*, 562 F.3d 1222, 1228 (10th Cir. 2009) (citation omitted).

his burden at trial, "all justifiable inferences are to be drawn in his favor."[119]

## II.    TARBET AND WINGET

Major General Tarbet ("Maj. Gen. Tarbet") and Brigadier General Winget ("Brig. Gen. Winget") move for summary judgment on the basis that Newton has failed to allege sufficient facts against them to sustain a cause of action. Although a person acting in a "supervisory role may incur liability, there is no concept of strict supervisor liability under section 1983."[120] Hence, "it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation."[121] Rather, "the plaintiff must establish a deliberate, intentional act by the supervisor," such that the "supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance."[122]

Here, Newton alleged in his complaint that Maj. Gen. Tarbet is the Adjutant General of the Guard and Brig. Gen. Winget is the State Air National Guard Commander.[123] Newton further alleged in his complaint that all actions against Newton by Major Teter and Lt. Col. Lee "occurred under the authority and command of" Maj. Gen. Tarbet and Brig. Gen. Winget.[124] This is a conclusory allegation, which cannot support a claim for relief. In stating the specific causes of action, Newton

---

[119] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citations omitted).

[120] *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quotations and citations omitted).

[121] *Id.*

[122] *Id.* at 994–95 (quotations and citations omitted).

[123] First Amended Complaint, ¶¶ 4–5 (Docket No. 1, Ex. A).

[124] *Id.* ¶ 63.

refers globally to "Defendants," without identifying any particular actions that are attributable to Maj. Gen. Tarbet and Brig. Gen. Winget. Thus, Newton has failed to allege specific acts or knowledge attributable to these individuals.

Newton contends, however, that Lt. Col. Lee's declaration supports that Maj. Gen. Tarbet and Brig. Gen. Winget had actual knowledge of the alleged constitutional violations. In his declaration, Lt. Col. Lee states, "while I kept my Utah Air National Guard chain of command generally informed of the issues with Mr. Newton's ATCS certificate withdrawal and suspensions from employment, I did not receive direction or guidance through my Utah Air National Guard chain of command on those issues."[125] Newton cites no other evidence to support his claims against these two individuals.

Although the declaration states the chain of command was generally informed of the issues, general information does not constitute actual knowledge and acquiescence in a constitutional violation. This is particularly so where procedural due process is the alleged constitutional violation because one may know proceedings are occurring without being aware that procedures are not being followed. Thus, the court concludes that a reasonable fact-finder could not find on the basis of this evidence that Maj. Gen. Tarbet and Brig. Gen. Winget directed the violation or had actual knowledge of it. Accordingly, the court grants summary judgment in favor of these two individuals and dismisses them from the case. Because Maj. Gen. Tarbet and Brig. Gen. Winget are dismissed from the case, all references to "Defendants" in the following sections pertain only to Major Teter and Lt. Col. Lee.

---

[125] Declaration of Wayne E. Lee, ¶ 7 (Docket No. 49, Ex. 9).

## III.    EQUAL PROTECTION

Defendants contend Newton's Equal Protection claim should be dismissed because his claim is based on a "class of one," rather than a recognized protected class.  While Newton falls under a protected class due to his age, he has not claimed age discrimination.  Defendants therefore are correct that Newton's claim rests on a class-of-one doctrine.

In a recent case, the United States Supreme Court declared that while the class-of-one doctrine does exist for an equal protection claim, it has no place in a public employee setting.  The class-of-one doctrine requires "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed."[126]  For example, in *Willowbrook v. Olech*, the zoning board typically "required only a 15-foot easement from other similarly situated property owners," to connect to a water supply, but "intentionally demanded a 33-foot easement" from Olech.[127]  Because such a departure was clear and raised concerns about arbitrary treatment, the zoning board had to come forward with a "rational basis for the difference in treatment."[128]

In contrast, employment decisions "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."[129]  These assessments rest "on a wide array of factors that are difficult to articulate and quantify."[130]  Consequently, when like

---

[126]    *Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2153 (2008).

[127]    *Willowbrook v. Olech*, 528 U.S. 562, 565 (2000).

[128]    *Id.* at 564 (citations omitted).

[129]    *Engquist*, 128 S. Ct. at 2154.

[130]    *Id.*

individuals are treated differently this "is an accepted consequence of the discretion granted."[131] To allow "a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that [governmental] officials are entrusted to exercise."[132] Hence, the Court concluded the class-of-one doctrine does not apply to public employment decisions.[133]

Newton's main assertion under his Equal Protection claim is that his supervisors treated him differently from other individuals who also had air traffic incidents. Newton attempts to distinguish his claim on the basis that the military deprived him of a property interest, which allegedly is not a personnel or disciplinary action. While Newton's certification was a property interest, the removal of it was tied to his performance as an employee. Hence, it is an employment claim. Moreover, removal of an ATCS certificate does not involve a clear standard like the zoning standard discussed in *Oleth*. Consequently, Newton's Equal Protection claim is dismissed.

## IV.    QUALIFIED IMMUNITY

Defendants also contend that they are entitled to qualified immunity because Newton either had no protected property right or the property right was not clearly established. Under qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[134] Although Defendants have

---

[131] *Id.*

[132] *Id.*

[133] *Id.* at 2155–56.

[134] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).

invoked the qualified immunity defense, it is Newton who must show (1) that the Defendants' conduct violated a statutory or constitutional right,[135] and (2) "the right was clearly established."[136] In determining whether Newton has met his burden, the court "view[s] the evidence in the light most favorable to [Newton]."[137]

Newton contends he was denied procedural due process both with regards to his ATCS certificate and his employment, and that those constitutional violations preclude qualified immunity. "Procedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision."[138] In the Tenth Circuit, courts engage in a two-step inquiry to determine if a person was denied procedural due process.[139] First, "[d]id the individual possess a protected interest to which due process protection was applicable?"[140] Second, "[w]as the individual afforded an appropriate level of process?"[141] Below, the court first addresses these two steps with respect to Newton's ATCS certificate and then to his employment.

---

[135] *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008) (quotations and citation omitted).

[136] *Id.* (quotations and citation omitted).

[137] *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (citations omitted).

[138] *Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1254 (10th Cir. 2005) (quotations and citation omitted).

[139] *Id.* (quotations and citation omitted).

[140] *Id.* (quotations and citation omitted).

[141] *Id.* (quotations and citation omitted).

## A.     Constitutional Violation Regarding ATCS Certificate

### i.     Property Interest - ATCS Certificate

Newton contends he was denied procedural due process when his ATCS certificate was suspended and withdrawn, and that constitutional violation precludes qualified immunity.  To be an air traffic controller, one must obtain a license.  Newton contends that his license constituted a protected property interest.  "Property interests are not created by the Constitution, but rather by independent sources such a state law."[142]  In *In re Horizon Air*, the district court determined that "[a]n air carrier operating certificate is a significant property interest."[143]  Although the certificate was issued by the FAA, and subject to its regulation and control, it did "not preclude the certificate from being treated as a property right."[144]  In *Tur*, the United States Court of Appeals for the Ninth Circuit stated that an airman "undoubtedly has a protectable property interest in his airman's certificate."[145]  Similarly, the Eleventh Circuit found that a "pilot certificate . . . is a cognizable property interest protectable by the procedural due process requirement of the fifth amendment."[146]  These decisions are in keeping with "clear law that establishes that an individual has a protected property interest in a professional license."[147]  Thus, the court concludes that Newton did have a

---

[142]  *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)).

[143]  *In re Horizon Air*, 156 B.R. 369, 376 (N.D.N.Y. 1993).

[144]  *Id.* (citation omitted).

[145]  *Tur v. Fed. Aviation Admin.*, 4 F.3d 766, 769 (9th Cir. 1993) (citation omitted).

[146]  *Pastrana v. United States*, 746 F.2d 1447, 1450 (11th Cir. 1984).

[147]  *Newton v. Utah Nat'l Guard*, No. 2:07cv00041, 2007 U.S. Dist. LEXIS 62814, at *11 (D. Utah July 31, 2007) (citations omitted).

protectable property interest in his ATCS certificate.

ii.     Appropriate Level of Due Process

"It is axiomatic that due process is flexible and calls for such procedural protections as the particular situation demands."[148]  It is also clear, however, that deprivation of a property interest requires "notice and an opportunity for hearing appropriate to the nature of the case."[149]  Here, Lt. Col. Lee informed Newton that he suspended his ATCS certificate based on five incidents.  Lt. Col. Lee summarized the five incidents, but did not provide the Incident Review Board reports despite requests for them.  Newton responded to each of the summarized allegations.[150]  Lt. Col. Lee, however, did not forward his response on three of the five allegations to the decision maker.  Moreover, Newton received no notice regarding the additional allegations Lt. Col. Lee included in the withdrawal packet, nor was he afforded an opportunity to respond to them.[151]  Viewing these facts in a light most favorable to Newton, a reasonable fact-finder could conclude that Newton was not afforded an appropriate level of process.  Newton has therefore sufficiently alleged a constitutional violation.

---

[148]  *Tur*, 4 F.3d at 769 (quotations and citations omitted).

[149]  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) (quotations and citation omitted).

[150]  The court does not address whether a written response constitutes a sufficient "hearing" to meet the requirements of procedural due process, or whether more is required, because that issue was not briefed by the parties in this motion.

[151]  Although Duke declared he did not consider the allegation about Newton's purported ethical violation, this still leaves at issue the allegation regarding an improper "point out."

### iii. Clearly Established Right

Defendants contend that even if Newton does have a protected property right in his ATCS certificate, they are still entitled to qualified immunity because the law was not clearly established in 2003 and 2004. A law is clearly established when the contours of the right are sufficiently clear "that an objectively reasonable officer would understand that what [he] is doing violates that right."[152] In other words, an official is "entitled to fair warning that his conduct deprived [a person] of a constitutional right."[153] Notably, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful."[154]

*Tur*, *In re Horizon Air*, *Pastrana*, and a number of other professional license cases[155] all were decided before 2003. While those cases addressed an air carrier certificate, airman certificate, a pilot's license, and other professional licenses, each concluded that such licenses were a protectable property interest. Moreover, by 2003, the law was well-established that before a person may be deprived of a protected property interest, he must be afforded due process. Based on this decisional law, the court concludes that it applies with obvious clarity to ATCS certificates as well. Accordingly, Major Teter and Lt. Col. Lee are not entitled to qualified immunity because they had fair warning.

---

[152] *Roska v. Peterson*, 328 F.3d 1230, 1247 (10th Cir. 2003) (citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)).

[153] *Id.* (quotations and citation omitted).

[154] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quotations and citation omitted).

[155] *See, e.g.*, *Newton*, 2007 U.S. Dist. LEXIS 62814, at *11.

### C.  Constitutional Violation Regarding Employment

#### i.  Property Interest - Employment

Defendants also seek dismissal of Newton's employment claims.  "If the government gives a public employee assurances of continued employment or conditions dismissal only for specific reasons, the public employee has a property interest in continued employment."[156]  The Tenth Circuit has likewise held, "if a statute . . . restricts the reasons for discharge to 'just cause shown,' then the employee has a right to continued employment until such grounds or causes are shown."[157]

 Newton contends he has a property interest in continued employment on the basis that he was employed under 32 U.S.C. § 709, and that statute only allows separation from employment "for cause."[158]  The parties dispute, however, Newton's employee status.  Defendants contend he was employed under title 5.  Newton contends he was employed under title 5 and section 709.  For purposes of this analysis, the court assumes, without deciding, that Newton was a section 709 employee.[159]

#### ii.  Appropriate Level of Due Process

Newton contends he was denied procedural due process when he was first suspended for fourteen days and then indefinitely suspended.  As stated above, procedural due process requires

---

[156]  *Stone v. FDIC*, 179 F.3d 1368, 1374 (Fed. Cir. 1999) (citations omitted).

[157]  *Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1502 (10th Cir. 1984).

[158]  32 U.S.C. § 709(f)(2).

[159]  The parties have submitted inconclusive information about Newton's employee status. Because all reasonable inferences are drawn in Newton's favor at this time, however, the court assumes for purposes of this motion that Newton was a section 709 employee.

notice and an opportunity to be heard. "The opportunity to respond must be 'at a meaningful time and in a meaningful manner.'"[160]  In the Tenth Circuit, "meaningful manner" requires: "'(1) an impartial tribunal; (2) notice of the charges and that the notice be given a reasonable time before hearing is to take place; and (3) except in emergency situations, that the hearing be held before termination becomes effective.'"[161]

a.    Fourteen-Day Suspension

Newton contends that he was denied an impartial tribunal because Lt. Col. Lee and Major Teter determined they wanted to terminate Newton before the investigation was completed.  In the Tenth Circuit, "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal."[162]  "[A] person claiming bias . . . must overcome a presumption of honesty and integrity in those serving as adjudicators."[163]

In this case, Major Teter initially provided notice of an intent to terminate Newton following the November 17, 2003 incident.[164]  Major Teter informed Newton the effective date of the proposed

---

[160] *Martinez v. N.M. Dep't of Health*, No. Civ 04-1326, 2006 U.S. Dist. LEXIS 95358, at *18 (D.N.M. Dec. 4, 2006) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

[161] *Id.* (quoting *Walker v. United States*, 744 F.2d 67, 70 (10th Cir. 1984), *overruled on other grounds by Melton v. City of Okla.*, 928 F.2d 920, 940 (10th Cir. 1991)).

[162] *Riggins v. Goodman*, 572 F.3d 1101, 1112 (10th Cir. 2009) (quotations and citation omitted).

[163] *Id.* (quotations and citations omitted).

[164] The notice also referred to the June 3, 2003 incident, and Newton's suspension and re-training after that incident.  Notice of Proposed Removal, ¶¶ 3, 5 (Docket No. 49, Ex. 2, Attach. 17). Newton contends Major Teter improperly relied upon this incident in his notice of proposed termination.  The court disagrees.  Attachment 4 to AFI 36-704 expressly provides that a basic penalty may be enhanced as a result of past offenses.  AFI 36-704 (Docket No. 49, Ex. 6, Attach. 3).

termination would be thirty days after the notice was issued. He allowed Newton ten days in which to file a response. Newton's attorney did file a response, and the parties held a formal meeting to discuss the proposed termination. Following that meeting, Lt. Col. Lee decided not to terminate Newton. Instead, he only imposed a fourteen-day suspension. Thus, while Lt. Col. Lee and Major Teter may have intended to terminate Newton before the investigation was completed, this was not the eventual outcome. Based on this evidence, the court concludes that Newton has failed to make a substantial showing of personal bias on the part of the decision-maker. Moreover, the evidence shows that Newton had sufficient notice and an opportunity to be heard before the suspension went into effect. Finally, the decision was upheld following two appeals. Newton was therefore afforded procedural due process on his fourteen-day suspension.

b.     <u>Indefinite Suspension</u>

Unlike the fourteen-day suspension, Newton's indefinite suspension was a non-disciplinary action. When Newton's ATCS certificate was withdrawn, he no longer met the qualifications to be an air traffic controller. Consequently, he was indefinitely suspended pending the outcome of his appeals. Newton contends the suspension was tainted by the purported improper withdrawal. In other words, because the ATCS proceeding was purportedly tainted, it foreclosed fair and effective consideration in the employment proceeding.

While it is true that Newton would not have been indefinitely suspended had his ATCS certificate not been withdrawn, the basis for the suspension is a substantive issue. Consequently, the

---

When prior incidents are used to enhance a penalty, the instruction requires such information to be included in the notice. *Id.* Major Teter appropriately followed these requirements.

court is precluded from addressing it under the *Feres* doctrine. With respect to the *procedures* that were followed in suspending Newton, those procedures were entirely separate from the procedures used to withdraw Newton's ATCS certificate. Thus, no taint accompanied the *procedures*. As with the fourteen-day suspension, Newton was provided notice and an opportunity to be heard. The requirements, therefore, for procedural due process were met. Because Newton has failed to show Defendants' conduct violated a statutory or constitutional right when they suspended him, they are entitled to qualified immunity on Newton's employment claim.[165]

Although the court dismisses Newton's employment claim, whether Newton may recover the lost wages that flowed from the purported procedural failures in withdrawing his ATCS certificate is a separate issue. Because that issue has not been briefed by the parties, the court does not reach it in this decision.

## V. COLOR OF STATE LAW

Defendants further contend that Newton's § 1983 due process claim should be dismissed because, as federal employees, they did not act under color of state law. The National Guard has "'hybrid' status as an agency with both federal and state characteristics."[166] Specifically,

> The National Guard occupies a unique position in the federal structure . . . This role does not fit neatly within the scope of either state or national concerns; historically the guard has been, and still remains, something of a hybrid. Within each state the National Guard is a state agency, under state authority and control. At the same time,

---

[165] Due to dismissal of Newton's employment claim on this ground, the issue of whether Newton exhausted his administrative remedies is moot because the challenged appeal only applied to his employment claims and not to his ATCS certificate.

[166] *Johnson v. Orr*, 780 F.2d 386, 388 (3d Cir. 1986).

-33-

the activity, makeup, and function of the Guard is provided for, to a large extent, by federal law.[167]

Despite this "hybrid" status, several circuit courts have concluded that § 1983 actions may be maintained against guard supervisors.[168]  In *Johnson*, the court noted that "a showing of the presence of 'state action,' does not require that the challenged action be pursuant to a state statute."[169] Instead, the focus is on "'whether there is a sufficiently close nexus between the State and the challenged action.'"[170]  When "the state has so far insinuated itself into a position of interdependence that there is a symbiotic relationship between the actor and the state," then one can fairly attribute the challenged action to the state.[171]

In 1968, an act was passed to clarify the relationship between the federal government and guard members.  One purpose of the act was to "'*recognize . . . the State characteristics of the National Guard.*'"[172]  Moreover, "each guard unit remained under the administration of the adjutant general," who is a state official,[173] and the governor of the respective states generally is the

---

[167]  *Id.* (quotations and citations omitted).

[168]  *See id.* at 395; *Rowe v. Tennessee*, 609 F.2d 259, 266 (6th Cir. 1979); *Knutson v. Wisconsin Air Nat'l Guard*, 995 F.2d 765, 768 (7th Cir. 1993).

[169]  *Johnson*, 780 F.2d at 390.

[170]  *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

[171]  *Id.* (quotations and citation omitted).

[172]  *Id.* at 391 (emphasis in original) (quoting H.R. Rep. No. 1823, 90th Cong., 2d Sess. (1968)).

[173]  *Id.* at 392.

commander-in-chief.[174]  Consequently, even though the guard may follow federal regulations, the Third Circuit expressly rejected that this precluded § 1983 actions because "the 1968 Act left the Guard's administrative authority largely at the state level."[175]

As in *Johnson*, Utah has adopted an extensive statutory scheme to regulate the Guard.[176] Under the statutory scheme, the Governor is the commander-in-chief,[177] and the Adjutant General is appointed by the Governor.[178]  Moreover, while the parties dispute Newton's status as a section 709 employee, it is undisputed that Newton's chain of supervision ended with "Maj Gen Brian Tarbet, Adjutant General of the State of Utah, State Employee."[179]  It is also undisputed that Major Teter and Lt. Col. Lee are employed under Title 32, not Title 5, and thus, fall under the purpose and provisions of the 1968 Act.[180]

Finally, contrary to Defendants' contention, Newton's employment status does not alter this analysis.  Indeed, in *Johnson*, the court stated, a plaintiff's "employment status is irrelevant . . . because that status does not inform us whether those injuring him . . . acted under color of state or

---

[174]  *See e.g.*, *id.* at 390.

[175]  *Id.* at 390, 392.

[176]  *See* Utah Code Ann. §§ 39-1-1 to 39-1-64 (2010).

[177]  *Id.* § 39-1-3.

[178]  *Id.* § 39-1-12(1)(a).

[179]  Affidavit of John Teter, ¶ 3 (Aug. 23, 2004) (Docket No. 61, Ex. 3).

[180]  *Id.*

federal law."[181] Thus, it is Major Teter and Lt. Col. Lee's employment status that is relevant, not Newton's. To the extent Newton's employment status is relevant, however, it weighs in Newton's favor because when Defendants suspended his ATCS certificate, Newton was *only* a civilian employee. He had retired from the military the prior year. This factor is significant based on the Tenth Circuit's *Martelon* decision.

In *Martelon*, the Tenth Circuit concluded that a § 1983 action could not be maintained by *military* personnel against military superiors.[182] In drawing this conclusion, the court distinguished *Martelon* from the district court's ruling in *Johnson* on the basis that the action taken against Johnson was incident to his civilian employment, not his military employment.[183] Thus, to the extent Newton's employment status is relevant, the fact that he was *only* a civilian employee at the time of his ATCS suspension favors allowing his § 1983 claim to proceed. Based on the totality of these circumstances, the court concludes Major Teter and Lt. Col. Lee's acted under color of state law.

## VI.     INTRA-MILITARY IMMUNITY (*FERES* DOCTRINE)

Finally, Defendants contend they are entitled to summary judgment because they are protected under intra-military immunity, otherwise known as the *Feres* doctrine. The court addresses this doctrine only in the context of Newton's ATCS certificate suspension and withdrawal because Newton's employment claims have been dismissed. Initially, the United States Supreme Court "created a judicial exception to the broad waiver of sovereign immunity in the Federal Tort Claims

---

[181] *Johnson*, 780 F.2d at 389 n.4 (quotation and citations omitted).

[182] *Martelon v. Temple*, 747 F.2d 1348, 1351 (10th Cir. 1984).

[183] *Id.* at 1350.

-36-

Act (FTCA)."[184]  Specifically, the Court declared, "[t]he federal government cannot be liable *under the FTCA* for injuries to *servicemen* where the injuries arise out of or are in the course of activity incident to service."[185]  Although the "incident to service" test initially applied to FTCA cases, the *Feres* doctrine has been expanded significantly.  It "now *generally* protects the government from suit for injuries arising from activities incident to military service."[186]  As a result, "[p]ractically any suit that implicates the military's judgments and decisions runs the risk of colliding with Feres."[187]  This is true even for constitutional claims against the military.[188]  If one could craft black letter law under the *Feres* doctrine, it would be that the doctrine "is applicable whenever a legal action would require a civilian court to examine decisions regarding management, discipline, supervision, and control of members of the armed forces of the United States."[189]  "The fact that a plaintiff is a civilian or not on active duty does not affect the analysis" typically.[190]

Consequently, the *Feres* doctrine also has been applied to civilians.  In *Norris v. Lehman*,

---

[184]  *Rick v. Nickels*, 295 F.3d 1124, 1127 (10th Cir. 2002).

[185]  *Id.* (quotations and citation omitted) (emphasis added).

[186]  *Dibble v. Fenimore*, 545 F.3d 208, 214–15 (2d Cir. 2008) (quotations, citations, and alterations omitted) (emphasis added).

[187]  *Ricks*, 295 F.3d at 1128 (quotations, citations, and emphasis omitted).

[188]  *Glenn v. Rumsfeld*, No. C 05-01787, 2006 U.S. Dist. LEXIS 18557, at *9 (N.D. Cal. Feb. 28, 2006).

[189]  *Id.* (quotations and citations omitted).

[190]  *Id.* (citations omitted).

Norris had retired from the military.[191]  He then received certification to teach naval science in public high schools under the Naval Junior Reserve Officer Training Corps ("NJROTC") program.[192]  His certification was issued by the Chief of Naval Education and Training ("CNET").[193]  The NJROTC program is a hybrid program in that the school district and Navy split the cost of funding.  The instructors are employed by the high school, but "the Secretary of the Navy is directed to hold the school authorities responsible for the conduct of the programs as prescribed."[194]  Moreover, the instructors must "maintain standards acceptable to the Military Department concerned."[195]

After Norris taught NJROTC for a number of years, a captain revoked Norris' certification because of an unsatisfactory report.[196]  "Because CNET certification is a prerequisite for a NJROTC instructor's position, Norris was terminated at Escambia High School."[197]  Norris filed suit claiming age discrimination and violation of the Due Process Clause.[198]  The district court granted summary judgment in favor of the military due to the *Feres* doctrine.  The Eleventh Circuit affirmed.

The Eleventh Circuit concluded "the decision to decertify Norris as an NJROTC instructor

---

[191]  *Norris v. Lehman*, 845 F.2d 283, 284 (11th Cir. 1988).

[192]  *Id.*

[193]  *Id.*

[194]  *Id.* (quotations and citations omitted).

[195]  *Id.* (quotations and citations omitted).

[196]  *Id.* at 285.

[197]  *Id.*

[198]  *Id.*

was essentially a military one."[199]  Even though Norris was a civilian, the relationship between Norris

and the captain, "in its very essence, was a military supervisor relationship."[200]  The Navy

administered the program and supervised Norris.  Norris had to follow military instructions, and

"only the Navy had the authority (1) to establish, disestablish or place on probation, NJROTC units

and (2) to withdraw certification as an NJROTC instructor."[201]  The very purpose of the program was

to train students for serving in the Navy; thus, Norris served an important role for the military.[202]

Due to the inherent military nature of Norris' employment, the *Feres* doctrine precluded judicial

review of the Navy's decision.

In another case, a man was employed "as a civilian member of the firefighter-crash/rescue

team" for the Mississippi Air National Guard ("MSANG").[203]  As part of his employment, he had

to have a physical.  He truthfully reported past heart trouble, but his condition was "stable" at the

time of employment, with no "overt signs or symptoms of cardiac dysfunction."[204]  Nevertheless, the

MSANG concluded he "could not be medically certified to perform the duties as a firefighter."[205]

Although the man asserted he was not disabled, he filed suit under the Americans with Disabilities

---

[199]  *Id.* at 286.

[200]  *Id.* at 287 (citations omitted).

[201]  *Id.*

[202]  *Id.*

[203]  *Presley v. Jackson Mun. Airport Auth.*, 94 F. Supp. 2d 755, 756 (S.D. Miss. 2000).

[204]  *Id.* at 757.

[205]  *Id.*

Act ("ADA") because he was terminated based on the MSANG's perception of him having a disability.[206]  The plaintiff sought to be re-employed by MSANG as part of the suit.

Because of the man's civilian status, the ADA did not foreclose his suit.[207]  Moreover, some courts have found that "personnel actions are not always integrally related to the military's unique structure."[208]  Nevertheless, employment decisions usually are nonjusticiable because they are "inherently military."[209]  The fact that the plaintiff was a civilian did not change this conclusion.

The crash/rescue team was stationed at a military base.[210]  Because military training was conducted at the base, "firefighter-crash/rescue equipment and personnel [had to be] on the base at all times," and were subject to military regulations.[211]  Part of the role of the crash-rescue team was to handle military ordnance and munitions, which included "access to classified information and equipment."[212]  Consequently the crash-rescue team's mission was "directly related to the military readiness" and "safety of its personnel."[213]  Based on these factors, the court concluded plaintiff's "position was of a decidedly military nature and his claimed injury indisputably arose incident to his

---

[206]  *Id.*

[207]  *Id.*

[208]  *Id.* at 758.

[209]  *Id.*

[210]  *Id.* at 761–62.

[211]  *Id.* at 762.

[212]  *Id.* at 763.

[213]  *Id.*

service to the military."[214]  Moreover, the function of the "crash/rescue team and the supervisory/administrative structure involved" were military in nature.[215]  Thus, his claim was nonjusticiable under the *Feres* doctrine.

In contrast to the *Norris* and *Presley* decisions, the court in *Glenn v. Rumsfeld* concluded it could review the military's decision to decertify a Junior Reserve Officers' Training Corps ("JROTC") instructor.  A complaint of child abuse was filed against the plaintiff.  It was investigated, but no basis for the allegations was found.  The military informed the plaintiff, however, that his certification was being revoked because the military had lost confidence in his ability to act as an instructor due to his poor judgment and lack of professionalism.[216]  When the plaintiff asked to review the evidentiary record and other information, his requests were denied either in whole or in part.[217]

The plaintiff filed suit claiming deprivation of due process.  In particular, the plaintiff asserted the military's "decision contravened internal regulations mandating an independent review by a Certification Board prior to final decision."[218]  The court concluded that plaintiff's substantive claim was nonjusticiable because the court could not review whether the plaintiff's decertification

---

[214]  *Id.* at 761.

[215]  *Id.*

[216]  *Glenn*, 2006 U.S. Dist. LEXIS 18557, at *4.

[217]  *Id.*

[218]  *Id.* at *5 (quotations and citation omitted).

was in the best interests of the military.[219]  The plaintiff's *procedural challenge*, however, was not barred because determining if the military had "failed to follow their own proper procedures . . . would not require [the court] to substitute its judgment as to the substance of the decertification decision."[220]

Likewise, in *Karr v. Carper*, the issue before the court was whether Delaware Army National Guard followed procedural requirements when it involuntarily separated a person from service.[221] Karr was involuntarily separated "based on substandard performance and dereliction of duty" allegations.[222]  The National Guard Regulations specified that when a commander recommended involuntary separation, the guard member had to have an opportunity to rebut or comment on the allegations before they were forwarded to the decision-maker.[223]  Additionally, if the commander included new allegations, the guard member also had to have an opportunity to rebut the new allegations.[224]  Karr was allowed to respond in writing to the allegations.[225]  Subsequently, however,

---

[219]  *Id.* at *15.

[220]  *Id.* at *17–18.

[221]  *Karr v. Carper*, 818 F. Supp. 687, 688 (D. Del. 1993); *see also United States ex rel. Karr v. Castle*, 746 F. Supp. 1231 (D. Del. 1990).  The latter decision was withdrawn by *Karr v. Castle*, 768 F. Supp. 1087 (D. Del. 1991), but it sets forth the factual background in greater detail, and is therefore useful on that basis.

[222]  *Karr*, 746 F. Supp. 1233.

[223]  *Karr*, 818 F. Supp. 690 (citation omitted).

[224]  *Id.* at 691 (citation omitted).

[225]  *Id.*

additional allegations were made against Karr, for which he "was given no opportunity to rebut."[226] Nevertheless, the decision-maker considered the new allegations when he concluded that Karr should be separated from duty.[227] The court vacated the decision because procedural requirements were not followed and held that Karr was entitled to a new evaluation.[228]

The distinguishing characteristic between *Glenn* and *Karr*, on the one hand, and other military cases, on the other hand, was the courts' scope of review. In *Glenn* and *Karr*, the courts looked only at whether procedural measures were followed. In *Kennedy v. Mendoza-Martinez*, the United States Supreme Court stated that procedural due process has to be safeguarded even "under the gravest of emergencies."[229] While the importance of procedural due process is great, it does not implicate the substantive decisions of the military. It neither precludes the military from taking an action, nor specifies what the military's decision must be. Thus, *Glenn* and *Karr* are distinguishable from such cases as *Norris* and *Presley* because they do not implicate anything that is uniquely military in nature.

Here, Newton is a civilian, but his supervisors were all officers in the military. Newton provided air traffic control at the Utah Test and Training Range, which is a military test and training range. The range, however, also has civilian air traffic, and Newton was responsible "for the safe, orderly, and expeditious flow" of both types of air traffic. Newton's ATCS certification was issued

---

[226] *Id.*

[227] *Id.* at 692, 694.

[228] *Id.* at 694.

[229] *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165 (1963).

in 1968 by the FAA, not the military, so it did not fall exclusively under the purview of the military. Unlike *Norris* and *Presley*, Newton is not seeking reinstatement, nor is he asking the court to determine if the military's decision was supported *substantively*. Instead, he is asking the court to review whether proper *procedures* were followed in suspending and withdrawing his ATCS certificate. Because Newton's claim involves a narrow review, limited to procedural due process, the court concludes the *Feres* doctrine does not bar Newton's claim against Major Teter and Lt. Col. Lee for his ATCS certificate suspension and withdrawal.

## CONCLUSION

Based on the foregoing discussion, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.[230] The court grants summary judgment in Major General Tarbet and Brigadier General Winget's favor and hereby dismisses them. The court hereby dismisses Newton's employment claims based on procedural due process and equal protection. The court denies summary judgment on Newton's procedural due process claim pertaining to his ATCS certificate. Due to the *Feres* doctrine, however, Newton may only challenge the procedural actions of Major Teter and Lt. Col. Lee relating to Newton's ATCS certificate suspension and the withdrawal.

DATED this 19th day of February, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[230]  Docket No. 46.